**In re CAPITAL WEST INVESTORS, a California Limited Partnership, Debtor.**

Civ. No. 95–20323 SW.

United States District Court, N.D. California.

Sept. 20, 1995.

Craig M. Prim, Murray & Murray, Palo Alto, CA, for Capital West Investors.

Douglas Boven, Crosby Heafey Roach & May, Oakland, CA, for Trilex Financial Services, Inc.

Marcia E. Gerston, Levy Greenfield & Davidoff, San Jose, CA, for Jim Woodson and Denny McLarry.

Richard G. Wise, Greenstein DeLerome & Luchs, Washington, DC, Thomas C. Holman, Holman & O'Grady, San Francisco, CA, for Reilly Mortgage Group, Inc.

Victoria E. Young, U.S. Atty.'s Office, San Francisco, CA, Brendan Collins, U.S. Dept. of Justice, Washington, DC, for U.S.

## ORDER REVERSING AND REMANDING THE BANKRUPTCY COURT'S CONFIRMATION OF CAPITAL WEST'S PLAN OF REORGANIZATION

SPENCER WILLIAMS, District Judge.

Appellants Department of Housing and Urban Development ("HUD") and Reilly Mortgage Group, Inc. ("Reilly") brought this appeal from the bankruptcy court's confirmation of a Chapter 11 reorganization plan proposed by Appellee Capital West Investors ("Capital West"). Based on the following, the Court finds that the bankruptcy court erroneously balanced the objectives of the National Housing Act versus those of Chapter 11 of the Bankruptcy Act when it deleted provisions of the HUD Regulatory Agreement. Consequently, the case is REVERSED and REMANDED to the bankruptcy court for further proceedings consistent with this Court's opinion.

## BACKGROUND

Capital West is a California limited partnership that owns and operates The Woods, a 160 unit apartment complex in Fremont, California appraised at approximately $8.4 million. Capital West bought the property in 1985, assuming a note and first deed of trust serviced by Reilly ("Reilly Note"). The Reilly Note has an interest rate of 7.5 percent and a current outstanding balance of approximately $2,630,000.

The Reilly Note is insured by HUD as part of the Federal Housing Act Home Loan Mortgage Insurance Program. This program insures against the lender's loss in the event of a default, thereby enabling lenders to offer loans with small downpayments and low interest rates. If default occurs, HUD must pay 99 percent of the loan balance and take an assignment of the note.

When the Reilly Note originated in 1978, the holder of the note, Lincoln Park & Associates, executed a Regulatory Agreement with HUD that required compliance with certain HUD regulations. Capital West became bound by this agreement when it bought The Woods and assumed the Reilly Note.

The HUD Regulatory Agreement requires payments of monthly mortgage insurance premiums that decline each month over the term of the note. The agreement also contains "surplus cash" provisions that require HUD's approval before allowing any junior financing. HUD's policy is that a borrower must commit to pay the HUD loan and operational expenses before any junior financing can be secured.

After Capital West bought The Woods, HUD approved the placement of second and third notes secured upon the property. The second note ("Trilex Note") is due in 1997, has an adjustable interest rate, and is currently held by Trilex Financial Services in the amount of $3,435,315. The third note ("Woodson Note") is due upon demand, has an interest rate of 15 percent, and is held by Woodson & McLarry in the amount of $1,334,871.

In 1993, Capital West defaulted on the Woodson Note. Consequently, on May 21, 1993, Woodson and McLarry brought fore-

closure proceedings. Thereafter, Capital West filed for Chapter 11 bankruptcy and proposed a plan of reorganization to the bankruptcy court ("the Plan"). Under the Plan, the interest rate on the Woodson Note would be reduced from 15 to 12 percent and its term extended by 5 years. The interest rate on the Trilex note would be reduced by 2 percent and its term extended by ten years. The Reilly Note would remain unchanged except that: (1) Capital West would be relieved of the obligation to pay mortgage insurance; (2) the "surplus cash" provisions would be eliminated, and; (3) the provision requiring junior financing documents to include language allowing HUD to foreclose in the event of a deed in lieu of foreclosure would be eliminated.

Over Reilly's objections, Judge Morgan approved the Plan. Both Reilly and HUD have now appealed to this Court.

## LEGAL STANDARD

■ Pursuant to Rule 8013 of the Federal Rules of Bankruptcy, the district court may affirm, modify or reverse the bankruptcy court's decision, or remand for further proceedings. The factual determinations of the bankruptcy court are subject to the "clearly erroneous" standard, while the bankruptcy court's conclusions of law are subject to *de novo* review. *In re Comer*, 723 F.2d 737 (9th Cir.1984).

## ANALYSIS

The parties raise the following five issues on appeal: 1) whether the bankruptcy court properly balanced the goals and policies of the National Housing Act and Chapter 11 of the Bankruptcy Act; 2) whether the bankruptcy court's treatment of Reilly was fair and equitable within the meaning of § 1129(b) of the Bankruptcy Code; 3) whether the bankruptcy court properly concluded that the Plan did not unfairly discriminate against Reilly; 4) whether the bankruptcy court properly calculated the value of Reilly's secured claim; and 5) whether the bankruptcy court properly implemented the Plan.

As discussed below, the Court agrees with Appellants on the first issue. Because this issue is dispositive, the Court does not find it necessary to address Appellants' other four arguments.

I. *Balancing the Objectives of the National Housing Act Versus Those of Chapter 11 of the Bankruptcy Act*

■ Appellants contend that the bankruptcy court improperly balanced the objectives of the National Housing Act versus those of Chapter 11 of the Bankruptcy Act when it deleted certain provisions of the HUD Regulatory Agreement governing the Reilly Note. Capital West responds that the bankruptcy court's decision was the optimal outcome under both statutes because it preserved Reilly's, Trilex's and Woodson's rights as creditors while allowing The Woods to avoid foreclosure and to continue to provide 160 unit of low income housing. Since this is a mixed question of law and fact, the Court will apply a *de novo* standard of review. *Carpenters Pension Trust Fund v. Underground Construction Co., Inc.*, 31 F.3d 776, 778 (9th Cir.1994); *United States v. McConney*, 728 F.2d 1195, 1202–03 (9th Cir.1984), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

■ When confronted with two different statutory schemes, the court must attempt to harmonize the goals and policies of each. *National Labor Relations Board v. Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). The primary objectives of the National Housing Act are to provide a "decent home and suitable living environment for every American family" by: (1) motivating lenders to loan money, and; (2) assisting private industry to avoid foreclosure. *Beck Park Apartments v. U.S. Department of Housing*, 695 F.2d 366, 368 (9th Cir.1982); *U.S. v. American Nat'l Bank*, 443 F.Supp. 167 (N.D.Ill.1977). The objectives of Chapter 11 are: (1) to permit successful rehabilitation of the debtor, and; (2) to maximize the value of the bankruptcy estate. *Id.* at 527, 104 S.Ct. at 1196; *Toibb v. Radloff*, 501 U.S. 157, 163, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991).

In its initial memorandum opinion confirming the Plan, the bankruptcy court found that the Plan "preserve[d] the concerns of both

Chapter 11 and the National Housing Act." The court determined that removing the mortgage insurance requirement on the Reilly Note would allow Capital West to forestall foreclosure by using that money to refinance the Woodson Note. The court also found that removal of the "surplus cash" provisions of the Reilly Note would enable Capital West to "restructure payment without the burden of meeting other obligations first." The court concluded by stating:

> By allowing Capital West the best possible chance to succeed, the court furthers the Federal Housing Act's purpose by enabling Capital West to continue to provide affordable housing to at least 160 individuals ... If Capital West were to suffer foreclosure, the purposes of both Chapter 11 and the Federal Housing Act would be frustrated.

After both Reilly and HUD filed motions for reconsideration, the bankruptcy court issued another opinion, further concluding that "[a]ny negative effect on the secondary housing market is outweighed by the benefit of providing affordable housing."

The Court finds that the bankruptcy court's decision improperly balanced the goals and policies of the National Housing Act versus those of Chapter 11 of the Bankruptcy Act. First, the positive effect of the Plan in forestalling foreclosure on The Woods' 160 units of housing pales in comparison to the possible negative ramifications that will result from the precedential effect of allowing a debtor to avoid provisions of a HUD Regulatory Agreement simply by filing for bankruptcy. If HUD guarantees can be easily circumvented through bankruptcy, banks will be more likely to require larger downpayments or charge higher interest rates for mortgages, in direct contravention of the purpose behind the National Housing Act.

Second, deleting the "surplus cash" provisions will undermine HUD's policy in assuring safe and affordable housing. Without these provisions, debtors are relieved of the requirement that they reserve adequate funds to maintain and repair their property before using that money to pay off junior lien holders. Having accepted the benefits of HUD-insured loans in the form of lower interest payments, debtors should not thereafter be allowed to avoid their responsibility to provide suitable, well-maintained housing for their tenants.

Third, HUD-insured notes are traded as part of the Federal Housing Act Project Loan Certificate Series Pool in which private individuals own and trade interests. When the provisions of a HUD Regulatory Agreement are modified, the market value of the note to which they are attached is altered. For example, deleting the requirement that the debtor pay mortgage insurance makes a note more risky, thereby reducing its value at the agreed upon interest rate. Allowing bankruptcy courts to make such modifications will inject a substantial amount of uncertainty into this more than $1 trillion secondary mortgage market.

Fourth, and perhaps most importantly, Appellees have offered no legal precedent to support the bankruptcy court's actions, nor is the Court aware of any. The courts that have considered the legal effect of HUD Regulatory Agreements have emphasized the importance of the federal interest in enforcing their terms, and have uniformly refused to alter or delete their provisions. *See, e.g., In re EES Lambert Associates*, 62 B.R. 328, 336 (Bankr.N.D.Ill.1986) ("The regulatory [a]greement ... is not some slight contractual undertaking that can be circumvented by the filing of a bankruptcy petition."); *In re Marion Carefree*, 1994 WL 115911 (Bankr. N.D.Ohio) at * 2–3 (quoting *In re Bolin Oil, Co.*, 51 B.R. 936, 938 (Bankr.N.D.Ohio 1985)) (commenting that "[h]owever expansive the bankruptcy court's powers may be to protect the property interests of debtors-in-possession, it does not extend to enlarging the rights of a debtor under a contract or rewriting its terms").

In sum, the goals of Chapter 11 and the National Housing Act would be better served by a plan of reorganization that allows The Woods to avoid foreclosure, but does not inject such uncertainty into our nation's low-income housing market.

## CONCLUSION

Based on the foregoing, the Court finds that the bankruptcy court erred when it modified the HUD Regulatory Agreement. The case is REVERSED AND REMANDED to the bankruptcy court for further proceedings consistent with this Court's opinion.

IT IS SO ORDERED.